IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY ⎯⎯ D.C.

05 DEC 19 AM 11: 13

THOMAS M. GOULD
CLERK U.S. DISTRICT COURT
W.D. OF TN. MEMPHIS

|  |  |  |
|---|---|---|
| WYATT BROWN, | X | |
| Plaintiff, | X | |
| vs. | X | No. 05-2676-Ml/An |
| HARRELL WATTS, et al., | X | |
| Defendants. | X | |

ORDER ASSESSING $250 FILING FEE
ORDER OF DISMISSAL
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
AND
NOTICE OF APPELLATE FILING FEE

Plaintiff Wyatt Brown, Bureau of Prisons ("BOP") inmate registration number 08251-058, an inmate at the Federal Correctional Institution ("FCI-Memphis") in Memphis, Tennessee,[1] filed a pro se complaint pursuant to Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1974), on September 15, 2005.[2] The Clerk shall record the defendants as Harrell Watts, Administrator of National Appeals for the BOP; K.M. White, Regional Director of the Mid-Atlantic Office of the BOP; former FCI-Memphis warden T.C.

---

[1] The word "prison" is used in this order to refer to all places of confinement or incarceration, including jails, penal farms, detention and classification facilities, or halfway houses.

[2] Although the complaint states, on its face, that it is brought pursuant to 42 U.S.C. § 1983, Brown is a federal prisoner. In order to state a § 1983 claim, plaintiff must allege action under color of state law. West v. Atkins, 487 U.S. 42, 55-57 (1988). Because plaintiff is in the custody of the BOP, which acts under color of federal law, the Court construes the complaint as one brought pursuant to Bivens.


This document entered on the docket sheet in compliance with Rule 58 and/or 79(a) FRCP on 12-19-05



Outlaw; FCI-Memphis Associate Warden Claude Mayes; FCI-Memphis Health Services Administrator Joyce Anderson; FCI-Memphis Clinical Director Nahem Naimey, M.D.; and FCI-Memphis Health Systems Specialist Laura Sifford.

I.   Assessment of Filing Fee

Under the Prison Litigation Reform Act of 1995 ("PLRA"), 28 U.S.C. § 1915(b), a prisoner bringing a civil action must pay the full filing fee of $250 required by 28 U.S.C. § 1914(a).[3] The in forma pauperis statute, 28 U.S.C. § 1915(a), merely provides the prisoner the opportunity to make a "downpayment" of a partial filing fee and pay the remainder in installments.

In this case, the plaintiff has properly completed and submitted both an in forma pauperis affidavit containing a certification by the trust fund officer and a trust fund account statement. Pursuant to 28 U.S.C. § 1915(b)(1), it is ORDERED that the plaintiff cooperate fully with prison officials in carrying out this order. It is further ORDERED that the trust fund officer at plaintiff's prison shall calculate a partial initial filing fee equal to twenty percent (20%) of the greater of the average balance in or deposits to the plaintiff's trust fund account for the six months immediately preceding the completion of the affidavit. When the account contains any funds, the trust fund officer shall collect them and pay them directly to the Clerk of Court. If the funds in plaintiff's account are insufficient to pay the full

---

[3] Effective March 7, 2005, the civil filing fee was increased to $250 from $150.

2

amount of the initial partial filing fee, the prison official is instructed to withdraw all of the funds in the plaintiff's account, and forward them to the Clerk of Court. On each occasion that funds are subsequently credited to plaintiff's account, the prison official shall immediately withdraw those funds and forward them to the Clerk of Court, until the initial partial filing fee is paid in full.

It is further ORDERED that, after the initial partial filing fee is fully paid, the trust fund officer shall withdraw from the plaintiff's account and pay to the Clerk of this Court monthly payments equal to twenty percent (20%) of all deposits credited to plaintiff's account during the preceding month, but only when the amount in the account exceeds $10.00, until the entire $250.00 filing fee is paid.

Each time that the trust fund officer makes a payment to the Court as required by this order, he shall print a copy of the prisoner's account statement showing all activity in the account since the last payment under this order and file it with the Clerk along with the payment.

All payments and account statements shall be sent to:

Clerk, United States District Court, Western District of Tennessee, 167 N. Main, Room 242, Memphis, TN 38103

and shall clearly identify plaintiff's name and the case number on the first page of this order.

If plaintiff is transferred to a different prison or released, he is ORDERED to notify the Court immediately of his

3

change of address. If still confined, he shall provide the officials at the new prison with a copy of this order.

If the plaintiff fails to abide by these or any other requirement of this order, the Court may impose appropriate sanctions, including a monetary fine, without any additional notice or hearing by the Court.

The Clerk shall mail a copy of this order to the prison official in charge of prison trust fund accounts at plaintiff's prison. The Clerk is further ORDERED to forward a copy of this order to the warden of the plaintiff's prison to ensure that the custodian of the plaintiff's inmate trust account complies with that portion of the PLRA pertaining to the payment of filing fees.

The obligation to pay this filing fee shall continue despite the immediate dismissal of this case. 28 U.S.C. § 1915(e)(2). The Clerk shall not issue process or serve any papers in this case.

II. Analysis of Plaintiff's Claims

The complaint alleges that, on or about May 14, 2003, plaintiff was diagnosed with "possible left lower pole renal stone" while incarcerated at a federal prison in Kentucky, but he was not told of this diagnosis. Plaintiff was transferred to FCI-Memphis on or about November 18, 2003.

On or about March 12, 2004, plaintiff reported to the medical staff at FCI-Memphis that he had been experiencing severe pain and vomiting for months. He was prescribed Zantac, an antacid medication. On or about November 18, 2004, plaintiff again reported

4

to medical staff that he was suffering severe pain and vomiting. On December 10, 2004, plaintiff reported to medical staff that his family was willing to pay for any necessary treatment to relieve his pain. Plaintiff was informed that a physicians assistant ("PA") would discuss treatment options with defendant Naimey, but plaintiff received no treatment other than an examination. On December 21, 2004, plaintiff advised the medical staff that he was suffering severe pain and had difficulty urinating. Plaintiff was diagnosed with blood and infection in his urine and was prescribed antibiotics. On December 22, 2004, plaintiff reported that the pain in his groin was growing more intense. He was diagnosed with prostatitis and prescribed Tylenol. It was also recommended that plaintiff be examined by a urologist.

Plaintiff was transported to the emergency room of a local hospital on January 11, 2005, complaining of pain radiating from his testicle and lower stomach and of vomiting. He was diagnosed with epididymitis, which is the infection of a small gland next to the testicle, and Hydrocele on his left testicle. He was prescribed antibiotics and pain medication.

On January 18, 2005, plaintiff reported to clinic personnel that his pain continued to increase and now included his left kidney area. He was prescribed ibuprofen.

On February 1, 2005, plaintiff reported to clinical staff that he was suffering excruciating pain and he complained that, although he had been assured that he was scheduled for treatment, he had not received it. On February 2, 2005, plaintiff reported to

5

clinical staff that his pain continued to increase. He was examined by defendant Naimey, who found extreme inflammation of his testicles and large amounts of blood in his urine. Plaintiff was prescribed Percocet for pain. On February 3, 2005, x-rays were taken which revealed kidney stones. Defendant Naimey renewed the Percocet prescription on February 4, 2005.

On February 8, 2005, plaintiff was transported to the Shappley Clinic to be evaluated for possible urethral strictures, which plaintiff seems to believe was inappropriate because the x-rays revealed the presence of kidney stones. Dr. Shappley concluded that plaintiff had a hydrocele on his right testicle and a 1 cm. kidney stone on his left kidney. The doctor recommended a cystoscopy, optical uretomy, left JJ stent insertion, and lithotripsy.

On February 9, 2005, defendant Naimey changed plaintiff's prescription from Percocet to Darvocet and told plaintiff it would be at least thirty days before the procedures would be scheduled. From February 10, 2005 through February 14, 2005, plaintiff experienced nausea, numbness, and dizziness from the Darvocet. On February 14, 2005, clinic staff changed plaintiff's prescription back to Percocet. That prescription was renewed several times while plaintiff waited to have the treatment prescribed by Dr. Shappley, and it was renewed again several times in the period following the procedures.

Plaintiff asked defendant Sifford on February 16, 2005 when he would have the procedures recommended by the doctor, and he

6

was told that the utilization review committee had not met since the recommendation was made. Plaintiff repeated his concerns about the delay to defendants Naimey and Mayes on February 16, 2005.

On March 22, 2005, forty-two (42) days after Dr. Shappley prescribed his treatment plan, plaintiff was transported to an outside hospital where the procedures were performed. On April 6, 2005, plaintiff was transported to the Shappley Clinic, where the left JJ stent was removed and a follow-up x-ray was recommended for six months later.

On April 15, 2005, plaintiff told clinical staff he was experiencing excruciating pain in his lower abdomen, right lower flank, and testicles. A PA concluded he suffered from back spasms and prescribed motrin. Plaintiff reported to the clinic on April 19, 2005, and a PA tested his urine for blood and reported there was no blood in his urine and that he was in fine condition and should not worry.

On April 28, 2005, plaintiff reported to clinical staff that he was experiencing pain in his abdomen, trouble urinating, and vomiting. He was told to watch the call-outs. Later that day, plaintiff told defendant Naimey that he was having pain in his abdomen, testicles, and left flank. Naimey found traces of blood in plaintiff's urine and a very inflamed prostate. He reminded Naimey that he had not received treatment for the prostatitis that had been diagnosed on December 22, 2004. Naimey prescribed antibiotics and ibuprofen and ordered an x-ray.

7

On May 3, 2005, plaintiff again reported to clinical staff that he was experiencing extreme pain in his abdomen and testicles. He was advised to watch the call-outs. Later that day, while attending a computer class, plaintiff was in so much pain that the education supervisor released him to report to the clinic after calling ahead for permission. At the clinic, the PA, who is not a party to this action, refused to treat plaintiff, stating that he was already taking enough medications. The PA called for back up and three officers arrived and told plaintiff to leave the clinic even though one officer verified that he had transported plaintiff to the outside hospital on occasion. While walking back to the housing unit, plaintiff began to vomit what appeared to be blood. He was returned to the clinic and was examined, but he refused pain medication.

On May 4, 2005, plaintiff asked defendant Naimey for pain medication. Naimey told plaintiff that he was waiting for the x-ray results and he examined plaintiff's prostate, which was very inflamed. Naimey prescribed antibiotics but did not prescribe the pain medication plaintiff had requested.

Plaintiff complained about his symptoms to clinical staff on May 6, 2005, but a PA, who is not a party to this action, told him to let the antibiotics run their course. The PA also told plaintiff she would not prescribe any pain medication.

Plaintiff reported to clinical staff on May 10, 2005 and May 12, 2005 that he was experiencing severe pain in his abdomen and testicles. He was advised to watch the call-out for his

8

appointment. On May 13, 2005, plaintiff advised clinical staff that he was still in pain and needed to see defendant Naimey. Naimey told plaintiff that he did not want to prescribe pain medication along with antibiotics and scheduled an appointment for plaintiff for May 16, 2005. During that appointment, Naimey told plaintiff that the x-rays revealed a 7 cm. kidney stone in his left kidney. Naimey also examined plaintiff's prostate and found it to be very inflamed. Naimey prescribed a twenty-eight (28) day course of antibiotics and recommended that he be examined by a urologist, but he refused to provide plaintiff any pain medication.

On May 25, 2005, plaintiff reported to clinical staff that he was experiencing severe pain in his testicles, abdomen, and lower right flank. He was told to watch the call-out. Later that date, defendant Naimey examined plaintiff and prescribed antibiotics and Naproxin for pain.

Plaintiff reported to clinical staff on May 27, 2005; June 2, 2005; June 6, 2005; and June 10, 2005 complaining of pain. In addition, plaintiff complained of difficulty urinating on May 27, 2005 and of pain in his rectum on June 2, 2005; June 6, 2005 ; and June 10, 2005. On each occasion, he was told to watch the call-outs. Plaintiff returned to the clinic with similar complaints on June 16, 2005 and was examined by defendant Naimey, who prescribed antibiotics and Naproxin for pain.

Plaintiff reported to clinical staff on June 24, 2005; June 27, 2005; and July 5, 2005 complaining of pain. He was told to watch the call-outs. Plaintiff was examined by defendant Naimey on

9

July 11, 2005, who discovered that plaintiff's prostate was still very inflamed. Naimey told plaintiff that he was recommending that plaintiff be examined by Dr. Shappley.

Plaintiff was transported to the Shappley Clinic on July 19, 2005, where x-rays were performed that revealed a .7 cm. kidney stone fragment from the previous lithotripsy. Dr. Shappley also performed an ultrasound and a cystoscopy. The doctor recommended a follow-up in eight weeks, prostate massage three times a week, and antibiotics.

On August 2, 2005, plaintiff reported to defendant Naimey that the doctor's recommendation of prostate massage was not being followed. Plaintiff also expressed concerns that the delays in treatment were exacerbating his condition and, although he had seen Dr. Shappley seven times, no progress had been made and he was forced to suffer excruciating pain. Plaintiff also complained that Naimey had misinformed him about the procedure for removing the hydrocele. Naimey had told the plaintiff a large incision would be made and his testicles removed from the scrotum and that there would be a long recovery time. Dr. Shappley, however, had described a simple process with a small incision and a speedy recovery time. In response, Naimey allegedly refused to discuss the matters and told plaintiff to leave and that he would schedule an appointment for August 8, 2005.

On August 6, 2005, defendant Naimey told plaintiff that the prostate massages would begin on August 8, 2005 and that he would be prescribed more antibiotics. Plaintiff received his first

10

prostate massage on August 8, 2005, twenty-two (22) days after they were recommended by Dr. Shappley. He also did not receive prostate massages on at least six occasions from August 9, 2005 through September 2, 2005 due to staff unavailability or staff refusal.

Plaintiff asserts that defendants Anderson, Naimey, and Sifford knew or should have known, as early as November 18, 2003, that plaintiff had been diagnosed with a kidney stone but they were deliberately indifferent to his serious medical needs from at least November 18, 2003 through February 8, 2005 when they ignored his complaints of pain and delayed scheduling an appointment with a radiologist. These defendants were also deliberately indifferent to plaintiff's serious medical needs from at least December 22, 2004 through July 19, 2005 when they ignored plaintiff's repeated complaints of pain and delayed any treatment for his prostatis. He contends these defendants were deliberately indifferent to his serious medical needs from at least March 12, 2004 to the present when they provided grossly inadequate medical care. Plaintiff further contends that these defendants improperly subjected him to narcotic prescriptions that have a detrimental effect on his health.

Plaintiff further contends that defendants Mayes, Anderson, Naimey, and Sifford were deliberately indifferent to his serious medical needs through their participation in the Utilization Review Committee that, by its mere existence, promotes the delay, denial, and interference with the medical needs of inmates.

11

Finally, plaintiff contends that defendants Watts, White, Outlaw, and Mayes were deliberately indifferent to the plaintiff's serious medical needs by failing to take action in response to his grievance. In addition, defendant Mayes is liable in his capacity as supervisor of the medical staff at FCI-Memphis.

The complaint seeks declaratory and injunctive relief and monetary damages in the amount of $436,012,500.

The Sixth Circuit has held that 42 U.S.C. § 1997e(a) requires a federal court to dismiss a complaint without prejudice whenever a prisoner brings a prison conditions claim without demonstrating that he has exhausted his administrative remedies. Brown v. Toombs, 139 F.3d 1102 (6th Cir. 1998); see Porter v. Nussle, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."); Booth v. Churner, 532 U.S. 731 (2001) (prisoner seeking only money damages must exhaust administrative remedies although damages are unavailable through grievance system). This requirement places an affirmative burden on prisoners of pleading particular facts demonstrating the complete exhaustion of claims. Knuckles El v. Toombs, 215 F.3d 640, 642 (6th Cir. 2000). To comply with the mandates of 42 U.S.C. § 1997e(a),

> a prisoner must plead his claims with specificity and show that they have been exhausted by attaching a copy of the applicable administrative dispositions to the complaint or, in the absence of written documentation, describe with specificity the administrative proceeding and its outcome.

12

Id. at 642; see also Boyd v. Corrections Corp. of Am., 380 F.3d 989, 985-96 (6th Cir. 2004) (describing the standard for demonstrating exhaustion when prison officials fail to respond in a timely manner to a grievance), cert. denied, 125 S. Ct. 1639 (2005); Baxter v. Rose, 305 F.3d 486 (6th Cir. 2002) (prisoner who fails to allege exhaustion adequately may not amend his complaint to avoid a sua sponte dismissal); Curry v. Scott, 249 F.3d 493, 503-04 (6th Cir. 2001) (no abuse of discretion for district court to dismiss for failure to exhaust when plaintiffs did not submit documents showing complete exhaustion of their claims or otherwise demonstrate exhaustion). Furthermore, § 1997(e) requires the prisoner to exhaust his administrative remedies before filing suit and, therefore, he cannot exhaust those remedies during the pendency of the action. Freeman v. Francis, 196 F.3d 641, 645 (6th Cir. 1999). Finally, the Sixth Circuit recently held that district courts are required to dismiss a complaint in its entirety, pursuant to 42 U.S.C. § 1997e(a), that contains any unexhausted claims. Jones Bey v. Johnson, 407 F.3d 801, 805-09 (6th Cir. 2005).

The BOP has adopted an administrative remedy program, 28 C.F.R. §§ 542.10-542.19, that is applicable to Bivens actions. See, e.g., Robinson v. Young, No. 00-6127, 20 Fed. Appx. 476, 477 (6th Cir. Sept. 26, 2001); Barksdale v. Rauschel, No. 99-2233, 2000 WL 1434492, at *1 (6th Cir. Sept. 18, 2000). The warden has the initial responsibility for responding to grievances. 28 C.F.R. § 542.11(a). An inmate who is not satisfied with the warden's response may appeal to the BOP's regional director "within 20

13

calendar days of the date the Warden signed the response" and, thereafter, to the general counsel of the BOP "within 30 calendar days of the date the Regional Director signed the response." Id. § 542.15(a). Moreover, according to the regulations, "response shall be made by the Warden . . . within 20 calendar days; by the Regional Director within 30 calendar days; and by the General Counsel within 40 calendar days." Id. § 542.18.

In this case, the plaintiff first sought an informal resolution of his grievance (BP-8) on or about December 20, 2004, which was apparently prior to the plaintiff's first appointment with Dr. Shappley. That informal grievance did not name any of the defendants, and it asked only that "my medical condition be attended in a more thorough manner including test [sic] or whatever is necessary to diagnose my problem, and relieve my pain." Defendant Anderson responded to the plaintiff's informal grievance on December 28, 2004 as follows:

> You were evaluated by your assigned provider on December 22, 204 [sic] at which time you were diagnosed with prostatitis. A urology consult was also [illegible] and your care will be discussed in the next Utilization Review Committee meeting. As instructed by your provider, please return to sick call if your condition does not improve or becomes worse with current treatment.

Plaintiff subsequently filed a formal grievance on or about January 5, 2005 concerning his treatment since "the latter part of" November 2004. The grievance names defendants Naimey, Anderson, Mayes, and Outlaw. Defendant Outlaw responded to the grievance on January 20, 2005. Plaintiff appealed to the BOP Regional Director on or about February 5, 2005, and the response is

14

dated March 29, 2005. Plaintiff's appeal to the BOP General Counsel is dated April 26, 2005. Plaintiff wrote a letter to the BOP General Counsel, dated June 11, 2005, to supplement his appeal with occurrences since the filing of his grievance. The response to plaintiff's appeal is dated June 16, 2005. Accordingly, plaintiff has arguably exhausted claims against defendants Naimey, Anderson, Mayes, and Outlaw for events occurring from mid-November, 2004 through June 16, 2005.

However, the plaintiff has not demonstrated that he exhausted his administrative remedies for his claims that pre-date mid-November, 2004, and he also has not demonstrated that he exhausted his administrative remedies on his claims against defendants Watts, White, and Sifford.

The Sixth Circuit recently stated that "[a] plaintiff who fails to allege exhaustion of administrative remedies through 'particularized averments' does not state a claim on which relief may be granted, and his complaint must be dismissed sua sponte." Baxter, 305 F.3d at 489. Moreover, pursuant to the recent decision in Jones Bey, a district court must dismiss any complaint that contains unexhausted claims rather than attempting to sever the exhausted claims. Accordingly, the Court DISMISSES the complaint in its entirety, without prejudice, pursuant to 42 U.S.C. § 1997e(a).[4]

---

[4] As the Sixth Circuit has explained, "If the plaintiff has exhausted his administrative remedies, he may always refile his complaint and plead exhaustion with sufficient detail to meet our heightened pleading requirement, assuming that the relevant statute of limitations has not run." Baxter, 305 F.3d at 489.

15

III. <u>Appeal Issues</u>

The next issue to be addressed is whether plaintiff should be allowed to appeal this decision <u>in forma pauperis</u>. Twenty-eight U.S.C. § 1915(a)(3) provides that an appeal may not be taken <u>in forma pauperis</u> if the trial court certifies in writing that it is not taken in good faith.

The good faith standard is an objective one. <u>Coppedge v. United States</u>, 369 U.S. 438, 445 (1962). An appeal is not taken in good faith if the issue presented is frivolous. <u>Id.</u> Accordingly, it would be inconsistent for a district court to determine that a complaint should be dismissed prior to service on the defendants, yet has sufficient merit to support an appeal <u>in forma pauperis</u>. <u>See</u> <u>Williams v. Kullman</u>, 722 F.2d 1048, 1050 n.1 (2d Cir. 1983). The same considerations that lead the Court to dismiss this case for failure to state a claim also compel the conclusion that an appeal would not be taken in good faith.

It is therefore CERTIFIED, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal in this matter by plaintiff is not taken in good faith and plaintiff may not proceed on appeal <u>in forma pauperis</u>.

The final matter to be addressed is the assessment of a filing fee if plaintiff appeals the dismissal of this case.[5] In

---

[5] Effective November 1, 2003, the fee for docketing an appeal is $250. <u>See</u> Judicial Conference Schedule of Fees, ¶ 1, Note following 28 U.S.C. § 1913. Under 28 U.S.C. § 1917, a district court also charges a $5 fee:

> Upon the filing of any separate or joint notice of appeal or application for appeal or upon the receipt of any order allowing, or notice of the allowance of, an appeal or of a writ of certiorari $5 shall be paid to the clerk of the district court, by the appellant

16

McGore v. Wrigglesworth, 114 F.3d 601, 610-11 (6th Cir. 1997), the Sixth Circuit set out specific procedures for implementing the PLRA. Therefore, the plaintiff is instructed that if he wishes to take advantage of the installment procedures for paying the appellate filing fee, he must comply with the procedures set out in McGore and § 1915(b).

IT IS SO ORDERED this 19 day of December, 2005.

JON PHIPPS McCALLA
UNITED STATES DISTRICT JUDGE

---

or petitioner.

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 4 in case 2:05-CV-02676 was distributed by fax, mail, or direct printing on December 19, 2005 to the parties listed.

---

Wyatt Brown
FCI-Memphis
08251-058
P.O. Box 34550
Memphis, TN 38184--055

Honorable Jon McCalla
US DISTRICT COURT